Indiana Law and the university policies required by it now threaten the plane of professors with adverse employment actions through and including termination or the loss of tenure if they're deemed to have inadequately exposed students to scholarly works from a variety of political or ideological frameworks that exist within their disciplines or if they're found to have inadequately fostered a culture of free inquiry, free expression and intellectual diversity. Everyone including the district court agrees that the four professors here are giving up protected academic speech that they would otherwise make and are engaging in speech that they otherwise would not only because of the imposition of the statute and the university policies. Does everyone agree on that counsel because I think everyone agrees that there's been some self-censorship but is it because of the statute? Yes, I believe even the district court found that they were chilling their speech because of the imposition of the statute and policies. The only question that the district court raised was whether that show was reasonable, objectively reasonable. And of course the district court didn't find that the situations that the professors face are far-fetched, that it's unlikely that the policies would be imposed upon them. It simply found that because the universities were in the process of implementing more or different subordinate policies, that show was not reasonable. And of course we disagree. Just to address that concern, would you outline for us what those facts were to show that intention? The objectively reasonable chill, your honor? Sure. So the circumstances, this is obviously a fact-specific inquiry as to each person and whether that chill is objectively reasonable. So we can start with Professor Carr. Professor Carr teaches in the area of, for example, Holocaust and genocide studies. He is particularly concerned that this requirement that he exposed students to of this variety of scholarly works and the diversity of viewpoints means that he is required to teach, for example, Holocaust revisionism. Professor Schuster... Has the university ever told him that he must? I don't believe so, your honor. That's certainly not in the record. That's part of the district court's rationale, right? One can predict the worst, but until the worst comes to pass, why are we litigating? Because if we can't litigate it at this juncture, where the professors are doing exactly what the statute requires of them, engaging in certain speech and not in... The statute doesn't require anything of the professors. The statute requires things of Indiana University and Purdue, right? Those universities may require things of the professors. And I take it that that's the district court's point. The university has not required anything of the professors. That was, I think, part of the district court's point in finding... It found that the act, that the professors did not have standing to challenge the act because according to the district court, it operated against the universities. But of course, that's just using the universities as the enforcement mechanism. And the universities have simply adopted the statute's terms wholesale. The universities could have implemented policies that provided greater degree of granularity in terms of what was required of them. Instead, the university's policies simply adopt the statutory language. That's more clear in the instance of IU, which simply said, added to its existing policies, and you must comply with SEA 202, the statute. So of course, if the universities wanted to provide additional guidance about the boundaries of what is required and what is prohibited, they could have done so. But the policies as they exist today are all the statute requires and clearly are being enforced and are requiring the professors... When you say clearly are being enforced, who have they been enforced against? Well, they're being enforced right now to the degree that they... Concretely, I gather that complaints have been made against one of the plaintiffs and the university said they're dismissed. What has the university done concretely that adversely affects any of the plaintiffs? So, just one brief clarification, Your Honor. The university hasn't said that that complaint was dismissed. It's just disappeared. Nothing further has happened beyond what's been described in the record. I'm asking a concrete question. What has the university done concretely that adversely affects any of the plaintiffs? The universities have applied their policies that the professors must, to use the language of this statute, expose students to scholarly works from a variety of political or ideological... What we're really trying to drill in on is this credible threat. Right. And so, even if you articulate the facts that the professors have done to identify self-censorship, I think the question that we're looking for is what made that objectively reasonable, the actions that the professors have taken based on... Let me give you an example of what I'm looking for. The university says to one of the plaintiffs, you're not getting a raise this year because you didn't, and then here, insert, do one of these things. Has it done that for any plaintiff? It has not done that, Judge, but that is akin... And they all have tenure. Has it said, we are rescinding your tenure, effective on a given date, because you haven't done, hmm? No. No, it hasn't. No, which is essentially... That would plainly give the plaintiff standing, but it just hasn't happened. That's true, but pre-enforcement challenges are obviously available to plaintiffs in a wide variety of First Amendment contexts, so the existence of this being a pre-enforcement challenge, of course, doesn't mean, ipso facto, that the professors lack standing. Rather, they have to show either a credible threat of enforcement or that they are self-censoring as a result of the statute and the chill is objectively reasonable. So you don't believe that if, once I've demonstrated I'm self-censoring, there is no need for a credible threat? It's more like, Judge, those are two sort of First Amendment theories to standing that exist in a circumstance like this, and of course, from our perspective, the credible threat of enforcement is the easiest way of getting there because the statute is being enforced, it has been enforced against another professor in a widely publicized manner during the pendency of this litigation, and of course, the universities are defendants here. Well, that was during the pendency of the litigation, and so I'm listening for what has occurred at the time the lawsuit was initiated. So at the time the lawsuit was initiated, the professors have been required to conform their conduct to what the policies and the statutes say they must do, and that is in the core of a pre-enforcement challenge. In fact, it's no different from the circumstance faced by the hunting protesters in Brown v. Kemp or the situation faced... When in Brown v. Kemp, you have the hunters who were being threatened with, if you don't do this, we will enforce, and so we don't have that here. But we have a circumstance where the hunters were, even in that circumstance, calling the police on these observers, and the police would come, and no enforcement actions were ever taken against them. So if a pre-enforcement challenge is inappropriate, Brown v. Kemp should have come out differently because none of those protesters had been disciplined or issued a citation. I mean, this is why these pre-enforcement challenges are so important in the context of the First Amendment, the Supreme Court has made clear that it needs breathing room to survive. And if you face circumstances like this, any reasonable professor is going to believe that their activities are governed by this statute. So... So if this statute said the professors must teach X or cannot teach Y, that's one thing, but that's not what SCA 202 says. So how is the chilling, the self-censorship, how is that traceable to this specific statute? What's the language in the statute that you're saying? The language in the statute is the language that's doing the work in each of the two provisions that we challenge. So it is this requirement that they expose students to a variety of political or ideological frameworks that may exist within their disciplines, and that they foster a culture of free inquiry, free expression, and intellectual diversity, where only intellectual diversity is... So I can imagine ways in which that's abused and would violate the professor's First Amendment rights, but that hasn't happened. And I can imagine a lot of ways in which it won't be abused. So any time a statute is capable of being abused, like, what's your test for when the fear is reasonable and traceable to the statutory language? So that is the objective reasonableness test. And so in each instance, we have to look to the circumstances that exist for any individual plaintiff and say, is the fact that you feel compelled to do, to engage in this speech or chilled from engaging in this speech, would an objective person feel chilled in that circumstance? And the answer, I mean, we believe that there's abundant evidence in the record to show that that chill is reasonable for each of the four plaintiffs. And of course, one of the ways that you can show objective reasonableness is how the statute has been enforced against others. And that's where we've cited, you know, during the pendency of this litigation, another professor has been disciplined for a single slide in a single PowerPoint presentation in a graduate level class. So we know that it's being enforced. Yes, of course, we agree that it has not been enforced in the sense of discipline being imposed against any of the plaintiffs here. But we know that this is, to use the language of Brown versus Kemp, not a policy that's sitting forgotten in a desk drawer. It is something that the universities are looking at and doing today. And also, the statute requires them to do so whenever a complaint is filed against any person, any faculty member under this. So we're not even just waiting until tenure decisions are being made or promotion decisions are being made. This is happening in real time, which is exactly how the complaint was filed against the professor who has been disciplined under the statute. Again, I think. And so that's a separate case. Would the I think you mentioned a complaint and it's against McDonald. Yes, that's right. And so that what occurred with that complaint? So that complaint was was filed as a result of Professor McDonald discussing the Israel Gaza war in during a summer session, of course, for individuals filed complaints arising from that particular talk that he gave. Two of them were made by parents of students and two of them were anonymous, so we don't know who who submitted those. So the university came to him and said, you know, these complaints have been filed. Explain yourself. And it just so happened that Professor McDonald had a transcript of the remarks he made. So he was able to give that information to the university. Now, what they've done with it, we don't know. But this is the situation that all professors are in. They're taking these steps that they otherwise wouldn't in order to make sure or try to the extent that they can to avoid running afoul of the statute. And I should highlight that's what the statute is designed to do on its face. What it what it is aimed at doing is controlling, governing the content of their instruction. So there can be little doubt that this is what its intent is. It's not just the fact that discipline may arise. Discipline is just the stick. The point of the statute is to change what they're doing today, to change their behavior so that it matches what the legislature expressed in terms of the statute. This is also no different from the the final claim raised by Professor Kilbourn, in which he specifically asked the university for clarification about what he would need to do in order to make sure he didn't violate the nondiscrimination policy. And in that instance, the university said, you've got all the guidance that exists. And this court found that he the fact that he was chilling his speech because he was afraid of running afoul of the university's policies. That was enough to confer standing for him to challenge that claim and for for prospective injunctive relief. I see that I have grossly run into my rebuttal time, so if there are no further questions, I'd like to save my final two minutes. Certainly, counsel. Mr. Lopry. Thank you. Good morning. And may it please the court. This court should affirm the district court for two reasons. For for the reason that plaintiffs do not have standing or a right claim in their challenge to Senate Enrolled Act 202. They don't have standing because they don't have an injury. In fact, that's fairly traceable to the act with their pre enforcement First Amendment challenge to the statute. The plaintiffs have to show either that their conduct is arguably affected with a constitutional interest, but prescribed and the credible threat of prosecution or an objectively reasonable chilling effect. As we heard from counsel on the other side, has the well-founded fear now occurred now that the policy is being enforced? It hasn't, Your Honor, because this fear can't be hypothetical. It can't be subjective. It can't be imaginary. Maybe you didn't hear my question. Counsel represented that the policy is being enforced. It has. So my question was, now, has the fear of the policy been enforced now become well-founded? It has not, Your Honor, because because of two reasons. First of all, we don't have any actual details of that enforcement against a different professor. And second, because plaintiffs don't need standing a year after the filing of their case, they need standing at the time they file their case. So a discussion of a complaint in an article published in November 2025 can't provide standing for a September 2024. It might not provide standing, but if the problem is ripeness, it might make the dispute ripe. The Supreme Court has held that a dispute unripe when it began can become ripe later on. So what about if we do this from the perspective of ripeness? Well, Your Honor, the professors still have a problem with ripeness because they haven't shown any instructions to change their syllabi or their pedagogies. They haven't provided any analysis of what terms of the complaint. By the way, is this newspaper article or any other evidence in the record? It was mentioned for the first time in plaintiff's reply brief on appeal. I'm asking a concrete, technical question. Sorry. Is it in the record? No, Your Honor. OK, thank you. So that is is just another problem when you when you come right down to it. And since to respond to your question to plaintiff earlier, Judge Easterbrook, nothing concrete has been done with the professors as recognized by the district court, and they haven't provided any. Can you go back to my question first and answer whether or not it's ripe? It is not ripe, Your Honor, and it's not right because it's contingent on events that haven't occurred and that plaintiffs haven't actually concretely laid out either for the district court or for this court, how they're actually affected by either the act directly or the policies that are being developed under it. And even even before counsel, if if a professor sees every professor around them or two or three of them getting disciplined in a way that infringes First Amendment rights, that compels speech, that chills their speech. Do they have to wait for a discipline there? Wouldn't that be an objectively reasonable fear that chilled their speech? That might be, Your Honor, but that's not what we have here. What we have here is universities that have been instructed to create policies regarding retention and tenure. I understand that, but to Judge Pryor's question, if if there is discipline, if other professors are being disciplined, how does that impact both rightness and standing? That's a hypothetical because it's not in the record. Sure. That brings us to the technical, to technical, factual questions, Your Honor, of how similar the course of conduct the professors wish to engage in is to whatever was disciplined and the rationale for the discipline and how that was done overall. Here we have very vague statements about edge cases that the professors are concerned about being told or not told to teach. And we have and we have sort of this this idea that they're worried the policies might somehow be enforced to do that. But as we've heard from the universities, as was told to the district court, as the district court recognized, these policies are still being developed. And as Professor McDonald acknowledged his deposition, you need these, these, these successive layers of policy to determine the details. Counsel, I'm just afraid you're answering the question we wish that you hoped we had asked. I apologize, Your Honor. Engaging with the hypothetical of what counsel has presented on the other side. And we're asking the policies in this hypothetical are now currently being enforced. In this hypothetical. Have we moved to or has the question changed as to whether or not the parties, the professors would have standing in ripeness with that change? Respectfully, Your Honor, I don't think so, because the policies that will determine what constitutes a scholarly work within that professor's academic discipline are still being determined at the departmental level. And contrary. But if it's being enforced, does it matter if it's interim? Take the hypothetical. Professors are being disciplined. Take a hypothetical. They tenure stripped, you're fired. We don't like what you said. Holocaust didn't happen. Do other teachers that teach in that area now have standing in a ripe claim or not? If they say that they want to do the same sort of thing, Your Honor. But we don't have that here. If if a professor is fired. Yes. Or loses tenure or is docked pay. Yes. Because they taught X or didn't teach Y. Yes. Other professors would have standing and have a right claim. I think that would make the fear reasonable. Yes, Your Honor. But we don't. But again, I want to emphasize that we don't have that here. And contrary to what the plaintiffs have said, the university policies don't just restate the act or say comply with the act. They say comply with the act, but preserve academic freedom and develop specific procedures. In IU's case, related to each academics, different each academic units, different missions in Purdue's case to develop them among the faculty of the schools or or collaboratively between the dean of the college and each academic unit's leadership. You indicated earlier that the Indiana University policies were interim. They are. And so the June 14th and the July 29th revised policies, they're not designated as interim. They are not designated designated as interim, Your Honor. And how are we making the determination they remain interim? I'm sorry, I don't think I understood the question. You indicated that they're interim. I'm sorry, Your Honor. The policies at the time that the plaintiffs sued were interim. And the the non-interim policies really. Really emphasize the importance of. Let me try it again. There's a July 14th, 2024 policy, and there's a July 29th, 2024 policy. Yes, Your Honor. And those revised policies, which are before the complaint, the operative complaint, those were both before the complaint. Yes. They're not designated as interim. No, Your Honor. But they do. But they were characterized by the plaintiffs in their deposition as depositions as stopgap motions or stopgap policies interim. My understanding is that they are, as recognized by plaintiffs, placeholders while the universities work through the details at the departmental level, because these details at the departmental level are what are really going to inform the professor's teaching. So they are not interim. They are the university's policies, and the department is to then develop. The departments develop the details that a professor can actually apply in their coursework. My my friend representing the universities will be able to speak more lucidly to that, Your Honor. But fundamentally, these departmental policies show how speculative and contingent plaintiff's concerns are, because Professor Shurik has described his campus's policy as a good job, and he voted for it when given the opportunity. And Professor Schuster has indicated that he has no concerns that his department chair will violate Purdue's commitment to freedom of expression in conducting a review. And to the extent that the that the plaintiffs are asserting today that this court should look at complaints outside of the retention, promotion, tenure, tenure arena, it's worth remembering that plaintiff's complaints did not challenge the provision of the act that provides for a complaint process about a professor's teaching. They're challenging the tenure, retention and promotion review. Because of these weaknesses, this court should should affirm the district court and find the plaintiffs do not have standing for a right claim. Thank you, Your Honors. Thank you, Mr. Lowry. Mr. Pittman. May it please the court, as the state explained, Article three jurisdiction. Mr. Pittman, allow me to first apologize to Mr. Lowry because I got ahead of him. And this question was more so should have been posed to you. So, Mr. Lowry, I apologize. I want to ask you about the policies. Are they interim or not? The IU policies were never labeled interim. The Purdue policies initially at the time of filing were each of them. And you see that in S-27 and S-4 actually did not even exist at the time of filing. It was December 2nd. Yes. December 2nd, 2024. It did exist. It was issued in 2017, but it did not have SCA 202 related language at the time of filing in September of 2024. And so that's the December 2024 S-4. Precisely. Two versions of S-4 exist in the record. The December 2024 one was the one that plaintiffs attached to their preliminary injunction briefing. And then weeks before the district court issued its decision, they supplemented the record with a June 2025 version. So that's that's the evolution with respect to those policies. And I would respectfully concur with my co-appellee, the state, not only that dismissal should be affirmed, but that it should be affirmed for several reasons, including that at the time of suit, policymaking was ongoing and still filtering down from the high level policies that plaintiffs challenge and working its way down to the local level where plaintiffs actually work. And as faculty members can implement those local policies and it I heard my friend on the other side say in opening opening remarks that the challenged policies effectively forwent granularity and that respectfully is not so. When did they become final? The policies? The two Purdue policies changed their express interim status to actually just cutting the word interim as of June or July of 2025. The IU policies never had an express interim label, but they were effectively you know, they referenced, contemplated and even required localized policymaking of the granular sort that my friend on the other side references. When? When were the IU policies enacted? Finalized, huh? They they were issued. Well, they were issued in the 50s, 60s and 70s. The ones that we're talking about in reference to this lawsuit. When were those finalized? The high level challenge policies were finalized in July of 2024 and then amended as recently as this past summer and versions that plaintiffs do not challenge. I don't think they're challenging the ones from the 50s, 60s or 70s. Well, and that's that's a good point. And I think it's a problem here because the question becomes what exactly about these longstanding policies that say much more only on the act? I'm sorry, Your Honor. The policies that address the act. Policies that address the act. Well, the lawsuit is limited to that. The policies at issue with respect to IU don't merely address the act. They are six, seven, eight page policies that have a sentence or sentence fragment that references the act or Article 39.5. I think the ones they reference is a docket 36-1, docket 36-2, docket 36-3 and updated ACA-33, docket 36-4. That's the faculty, library and tenure policy, the faculty, library and promotions policy, the faculty, library and annual reviews policy, as well as the academic appointee responsibilities and conduct policy cross reference in ACA-37. Are you with me now? Yes, Your Honor. All right. And to go first to ACA-21 at ACF-36-3, it says at page three that annual merits and salary reviews shall be conducted by the principal administrator of an academic unit under procedures approved by the faculty governance body of that unit. And ACA-21 elsewhere states that procedures for implementing this annual review policy shall be developed by each campus and each academic unit. And it says that those procedures shall comply with the requirements of Article 39.5. But, you know, if if the procedures shall comply with that article and plaintiffs are saying that that compliance is problematic, then the necessary next step is to look at the procedures that actually exist at the ground level. And I don't think anyone is. Thank you, counsel. Thank you. Ms. Pachter, anything further? Thank you, Judge. Just a few short points to address Judge Kohler's question regarding, you know, when would this be right? What if what if this were enforced against a number of other professors? Would three be enough? Would five be enough? And I think the obvious conclusion from the position that both the state and the universities have taken is that, no, their position is it wouldn't be right under those circumstances. And that's, of course, the problem with what we have here. And at the end of the day, the question that we're left with is, what are the professors to do? They have two choices. They can engage in the speech that they believe offends the policies in the act. They can they can refuse to engage in the compelled speech that they think it requires of them, or they can make the changes that they're making right now. But this court's case law makes clear that they need not subject themselves to enforcement or discipline before they have standing to be able to challenge these claims. Judge, it looked like you were. I'm not sure there isn't another option there of waiting. In which, of course, this court could have done in Brown versus Kemp. It didn't. They could have said, look, police, police officers are the people on the ground who are the ones enforcing this. Let's wait and see what their policies are to see what what is viewed as offending and what's not. But but that gives no guidance whatsoever to the people on the ground who are actually having their First Amendment rights curtailed. If there are no further. Do you think the job of the court is to give guidance as if the judges were attorneys rather than resolve concrete disputes? I would never want guidance. You hire an attorney. I would never say that to you of all people, Judge Easterbrook. So, no, that is absolutely not the role of a court. But the role of a court is to adjudicate a person's First Amendment rights when they're being violated. And that's what we have. Thank you, Your Honors. Thank you, counsel. The case is taken under advisement.